J-S01018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                              :            PENNSYLVANIA
                                                :

                      v.                         :

JONATHAN CEDRIC JACKSON       :

            Appellant        :     No. 1131 MDA 2024

Appeal from the Judgment of Sentence Entered July 10, 2024
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s): CP-22-CR-0001562-2022

BEFORE:   NICHOLS, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:          **FILED: APRIL 24, 2025**

Appellant, Jonathan Cedric Jackson, appeals from the judgment of
sentence entered in the Dauphin County Court of Common Pleas, following his
jury trial conviction for aggravated assault.[1]  We affirm.

The relevant facts and procedural history of this appeal are as follows.
On March 23, 2022, Appellant was involved in an altercation outside the
Bistline House Apartments in Swatara Township.  The trial court summarized
the witnesses' descriptions of the altercation as follows:

> At trial, David Reed testified that on March 23, 2022 he was
> living at Bistline House Apartments in Swatara Township,
> Dauphin County.  He explained that he had been walking
> home that evening around 6-7:00p.m. when, while in front

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. § 2702(a)(4).

of his building, he heard his name being called and saw two men wearing hoods approaching him. As they got closer to him, he recognized [Appellant] as one of the men. Mr. Reed also identified the second man as someone who is known by the nickname "Boo."[2] Appellant "got in Mr. Reed's face" and Mr. Reed asked him why he came to his house. Appellant said, "Get the f out of here." Mr. Reed saw something in Appellant's hand and Mr. Reed took the bookbag off that he was wearing because he felt something was about to "happen." Mr. Reed acknowledged that he hit Appellant.

Mr. Reed testified that at no time during the exchange with the two men did he have a gun. The individual identified as "Boo" punched [Mr. Reed] in the back of the head. At no point did Mr. Reed try to get into the bag he removed from his back. Mr. Reed recalled Appellant trying to stick him with an object he was holding in his left hand. At that point, Mr. Reed punched Appellant, and the two men fell to the ground. Appellant's friend "Boo" or Kariem punched Mr. Reed. Video from the altercation captured Appellant striking Mr. Reed in the back with an object in his hand. Following the altercation, Mr. Reed went into his building and the police were called. It was not until officers arrived that they pointed out to Mr. Reed that he was bleeding; Mr. Reed initially did not realize he had been stabbed. Mr. Reed was taken to the hospital where he was treated for three (3) stab wounds. Staples were used to close the wounds; [Mr. Reed] has three (3) scars which he showed to the jury, one (1) to his abdomen and two (2) towards his back.

Appellant testified that he is married to Kassandra Jackson, who has children with David Reed. He explained that from the time he began a relationship with Ms. Jackson in 2018, he and Mr. Reed had a contentious relationship. About six (6) weeks into their relationship, Appellant and Ms. Jackson broke up for a short while because of the text messages Mr. Reed was sending to Ms. Jackson. The two got back

_____

[2] Later at trial, the Commonwealth presented testimony from Kariem Eley. (*See* N.T. Trial, 4/17/24-4/18/24, at 92). Mr. Eley confirmed that he was Appellant's companion on the night in question. (*Id.* at 93-94).

together when Ms. Jackson confirmed that she was no longer interested in being with Mr. Reed.

Nevertheless, the two men had confrontations over the next few years. Appellant testified that Mr. Reed would use the children he shared with Ms. Jackson to try and get information about the couple and if they did not cooperate, Mr. Reed would become angry and curse at the children. Appellant explained that Mr. Reed would make threatening remarks towards him. It got to a point where Appellant told Mr. Reed that he was going to pursue a protection from abuse order against him if he did not stop making the threatening remarks. At a certain point, Mr. Reed and his son, Trey, reached out to Appellant to have a "man to man" sit down between the men. Appellant eventually agreed to the meet up but brought his brother with him. During the meeting Mr. Reed got into Appellant's face but he walked away.

On March 22, 2022, Appellant was at his home making dinner when Mr. Reed and Ms. Jackson's son, Trey, came to the door of his house. Ms. Jackson answered the door, and Appellant heard her say "oh, my God, David is out here." Appellant testified that he was making dinner at the time and cut his hand when he heard this. An exchange began and Appellant heard Mr. Reed say to Ms. Jackson "I'm going to get you, you're going to pay for this." Appellant yelled from the hallway of the home for Mr. Reed to get off his property. Appellant then heard Mr. Reed on the phone saying, "bring those things to 303—bring those things." Appellant believed the conversation was referencing guns. Mr. Reed and Trey attempted to force their way into the home, and it was then the police were called. Appellant testified that the police informed them to pursue a protection from abuse ("PFA") order.

Appellant explained that he called his brother to drive him to where Mr. Reed lived to get the address so that they could file for a PFA. The two men drove to the complex and got out of their vehicle to try and find a directory. Appellant was not looking for Mr. Reed when he saw him walking outside of the complex. Appellant testified that he called out to Mr. Reed and began to address the incident from the previous day and informed him that he was going to file a

PFA. Appellant testified that Mr. Reed said, "No nigga. The guns are coming. I'm shooting up your house." Appellant's brother told Mr. Reed to take the bag he was wearing on his back off. Appellant bent over to check what was in the bag but eventually ended up throwing it to get it away from Mr. Reed, who was saying that he was going to "F" Appellant up. Mr. Reed then struck Appellant in the left side of the face, and he fell down. Appellant got up and had a box cutter in his hand which he had taken from his pocket. Appellant acknowledged that he then began to "stick" Mr. Reed with the box cutter. Appellant explained the incident as brief, and then he left. He was arrested the next day.

(Trial Court Opinion, filed 9/16/24, at 3-6) (unnumbered) (record citations omitted).

Appellant proceeded to a jury trial on April 17, 2024. Prior to the jury's deliberations, the court provided a thorough self-defense instruction. (**See** N.T. Trial at 254-264). Thereafter, the jury convicted Appellant of one count of aggravated assault. On July 10, 2024, the court sentenced Appellant to thirty-three (33) to seventy-two (72) months' imprisonment. Appellant timely filed a post-sentence motion on July 17, 2024. In it, Appellant challenged the weight of the evidence supporting his convictions, as well as the discretionary aspects of sentencing. On July 18, 2024, the court denied Appellant's post-sentence motion.

Appellant timely filed a notice of appeal on August 8, 2024. On August 21, 2024, the court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Appellant timely filed his Rule 1925(b) statement on September 3, 2024.

Appellant now raises one issue for our review:

> The complainant had harassed [Appellant] the day earlier and there had been threats of firearm use. In an altercation the following day, [Appellant] testified that he was afraid of a firearm and there was testimony that a firearm was available to the complainant. Did the Commonwealth sufficiently disprove self-defense?

(Appellant's Brief at 5).

On appeal, Appellant argues that the Commonwealth did not disprove Appellant's self-defense claim beyond a reasonable doubt. First, Appellant asserts that he was free from fault in provoking the conflict. Specifically, Appellant cites testimony revealing a history of conflict between the parties. Appellant also claims that Mr. Reed escalated the tensions by removing his backpack during the parties' initial discussion. Appellant asserts that "[t]his is not a scenario where [Appellant] went to 'finish' a fight, but rather went to have a conversation and ultimately had to resort to utilizing a weapon." (*Id.* at 16).

Appellant also contends that he reasonably believed that he was in imminent danger of death or great bodily harm, and it was necessary for him to use force to save himself. Appellant maintains that the day before the altercation, Mr. Reed went to Appellant's home, threatened him, and referenced having a firearm. Based upon what Appellant knew about Mr. Reed at the time of the altercation, Appellant asserts that "[i]t would have been reasonable to respond to this threat of deadly force with another." (*Id.* at 19).

Finally, Appellant argues the Commonwealth failed to disprove

- 5 -

Appellant's duty to retreat. While Appellant acknowledges that "no firearm was ever actually seen," he emphasizes testimony that: 1) Mr. Reed indicated he would shoot Appellant; and 2) there was a loud "thud" when Mr. Reed's bag hit the ground, which was consistent with a firearm being inside the bag. (*Id.* at 22). Appellant avers that "[i]t would be impractical for an individual to have to wait to stare down the barrel of a firearm prior to defending themselves." (*Id.*) Appellant concludes that the Commonwealth failed to prove beyond a reasonable doubt that self-defense was not appropriate, and this Court must vacate his judgment of sentence on this basis. We disagree.

To succeed on a self-defense claim, a defendant must show:

> 1) the defendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly [force] to prevent such harm; 2) the defendant did not provoke the threat that resulted in the slaying; and 3) the defendant did not violate a duty to retreat.

*Commonwealth v. Green*, 273 A.3d 1080, 1084 (Pa.Super. 2022), *appeal denied*, ___ Pa. ___, 289 A.3d 522 (2022) (internal citations omitted). Regarding a defendant's reasonable belief of imminent danger, this Court has observed:

> The requirement of reasonable belief encompasses two aspects, one subjective and one objective. First, the defendant must have acted out of an honest, bona fide belief that he was in imminent danger, which involves consideration of the defendant's subjective state of mind. Second, the defendant's belief that he needed to defend himself with deadly force, if it existed, must be reasonable in light of the facts as they appeared to the defendant, a consideration that involves an objective analysis.

***Commonwealth v. Smith***, 97 A.3d 782, 787 (Pa.Super. 2014) (quoting

***Commonwealth v. Mouzon***, 617 Pa. 527, 551, 53 A.3d 738, 752 (2012)).

"Before the issue of self-defense may be submitted to a jury for consideration, a valid claim of self-defense must be made out as a matter of law, and this determination must be made by the trial judge." ***Green, supra*** at 1085 (quoting ***Commonwealth v. Hansley***, 24 A.3d 410, 420 (Pa.Super. 2011), *appeal denied*, 613 Pa. 642, 32 A.3d 1275 (2011)). A valid claim of self-defense

> may consist of evidence from whatever source. Such evidence may be adduced by the defendant as part of his case, or conceivably, may be found in the Commonwealth's own case in chief or be elicited through cross-examination. However, such evidence from whatever source must speak to [the aforementioned] three specific elements for a claim of self-defense to be placed in issue for a jury's consideration.

***Id.*** (quoting ***Hansley, supra*** at 420-21).

"If a defendant introduces evidence of self-defense, the Commonwealth bears the burden of disproving the self-defense claim beyond a reasonable doubt." ***Commonwealth v. Steele***, 234 A.3d 840, 846 (Pa.Super. 2020) (quoting ***Commonwealth v. Houser***, 610 Pa. 264, 275, 18 A.3d 1128, 1135 (2011)). "The Commonwealth must establish only one of [the aforementioned] three elements beyond a reasonable doubt to insulate its case from a self-defense challenge to the evidence." ***Smith, supra*** at 787. "The complainant can serve as a witness to the incident to refute a self-

defense claim." ***Id.*** at 788. "[I]f there is evidence supporting the three elements, then the decision as to whether the claim is a valid one is left to the jury and the jury must be charged properly thereon by the trial court." ***Green supra*** at 1085 (internal citation and quotation marks omitted).

Instantly, the trial court concluded that the jury properly rejected Appellant's self-defense claim:

> Here, it is clear that the jury rejected Appellant's contention that he reasonably believed that he was in danger. The evidence presented at trial established that Appellant and his brother went to Mr. Reed's apartment complex. The two men approached Mr. Reed, and a scuffle ensued. During the altercation Appellant retrieved a box cutter he had on his person and stabbed Mr. Reed three (3) times in his back and abdomen area. While Appellant testified that Mr. Reed had previously mentioned guns and shooting up his home, at the time of the altercation, no mention of a gun was made. Further, while Appellant maintained it was his belief that Mr. Reed had a gun in the bag he was carrying, a gun was never recovered. Additionally, in the video of the altercation that was offered into evidence, no gun is visible. Accordingly, the Commonwealth presented sufficient evidence to disprove that Appellant acted in self-defense.

(Trial Court Opinion at 7).

We emphasize that our review of both the notes of testimony and the surveillance footage confirms the trial court's conclusions.[3] Contrary to

---

[3] The record on appeal included the USB flash drive containing the surveillance video footage from Appellant's altercation with Mr. Reed. Initially, Mr. Reed walked toward the front of the apartment building. (***See*** Commonwealth's Exhibit 1 at 1:05). Mr. Reed stopped and turned to face the parking lot, at which point an orange knapsack or bag is visibly strapped to his back. (***Id.*** at 1:07). With Mr. Reed staring at the parking lot, Appellant and Mr. Eley exit
*(Footnote Continued Next Page)*

- 8 -

their vehicle. (*Id.* at 1:17). Appellant and Mr. Eley walked across the parking lot toward the sidewalk where Mr. Reed was standing. (*Id.* at 1:17-1:55). Appellant stood directly in front of Mr. Reed. (*Id.* at 1:55). Mr. Eley stood to the right of Mr. Reed, blocking Mr. Reed's path to the building's entrance. (*Id.*)

A discussion ensued, and Mr. Reed took the bag off his back and placed it on the ground near his feet. (*Id.* at 2:05-2:09). As the discussion continued, Appellant picked up the bag and tossed it across the sidewalk. (*Id.* at 2:09-2:18). The bag landed near the curb, approximately ten (10) feet away from where the trio was standing. Appellant then shifted his position, so that he and Mr. Eley stood between Mr. Reed and the bag. (*Id.* at 2:20). The men continued to exchange words, but Mr. Reed began to walk toward the bag. (*Id.* at 2:20-2:26).

Mr. Reed passed Mr. Eley while keeping his eyes fixed on Appellant. (*Id.* at 2:26-2:27). At that point, Mr. Eley pulled back his right arm and threw a sucker punch that landed on the right side of Mr. Reed's head. (*Id.* at 2:27-2:28). The sucker punch was followed by a second, less forceful punch to Mr. Reed's back. (*Id.* at 2:28-2:29). Mr. Reed stumbled forward for a few feet, and he regained his balance near the orange bag. (*Id.* at 2:29-2:32). At the same time, Appellant transferred an object from his left hand to his right hand. (*Id.*)

With Mr. Eley standing behind him, Appellant advanced on Mr. Reed while holding the object in front of him. (*Id.* at 2:34-2:35). As Appellant advanced, Mr. Reed backed away. (*Id.*) Appellant transferred the object to his left hand, and then Appellant reached for Mr. Reed with his right hand. (*Id.* at 2:36). Mr. Reed responded by throwing a right hook to the left side of Appellant's chin. (*Id.* at 2:36-2:37). Appellant immediately fell to the ground and landed on top of the orange bag.

The momentum from the punch also caused Mr. Reed to fall. (*Id.* at 2:38). As Mr. Reed attempted to stand, Mr. Eley rushed in and pushed him back to the ground. (*Id.* at 2:38-2:40). With Mr. Reed on the ground, Mr. Eley threw two quick punches. (*Id.* at 2:40-2:43). Mr. Reed again attempted to stand, but Appellant had circled behind him and stabbed Mr. Reed in the back. (*Id.* at 2:43). The stabbing caused Mr. Reed to fall flat on his back. (*Id.* at 2:43-2:44). With Mr. Reed on his back, Mr. Eley delivered a kick to Mr. Reed's head. (*Id.* at 2:44-2:46). Mr. Reed rolled over onto his side, and Appellant stabbed him once more. (*Id.* at 2:46-2:47). Simultaneously, Mr. Eley landed
*(Footnote Continued Next Page)*

Appellant's argument, the surveillance footage does nothing to support the inference that Mr. Reed possessed a weapon in his bag. Even if Mr. Reed did possess a weapon, Appellant effectively separated Mr. Reed from his bag by tossing it across the sidewalk. Thereafter, Appellant's companion threw the first punch in the altercation, and the two men worked in tandem to subdue Mr. Reed. When Mr. Reed attempted to defend himself, Appellant elevated the danger level by foregoing fisticuffs in favor of using the box cutter. Under these circumstances, Appellant could not have objectively believed that he needed to defend himself with deadly force. **See Smith, supra**. Thus, we agree with the court's conclusion that the Commonwealth disproved Appellant's self-defense claim beyond a reasonable doubt. **See Steele, supra**. Accordingly, we affirm.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/24/2025

---

another kick to the middle of Mr. Reed's back. (**Id.**) Appellant stabbed Mr. Reed a final time, and Mr. Eley landed a final kick, before the men fled from the scene and returned to their vehicle. (**Id.** at 2:47-2:53).

- 10 -